UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DEBBIE WORSHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03 C 1467 |
| | ) | |
| CHICAGO PARK DISTRICT, | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Debbie Worsham filed suit against the Chicago Park District (the "Park District")

alleging sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e

*et seq.*; violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*; and

breach of an implied employment contract. Specifically, Worsham claims that the Park District

demoted her to a less desirable position because she voiced her opinion at a staff meeting, and

subjected her to different terms and conditions of employment than similarly situated male

employees. Worsham also claims that the Park District failed to offer her the same or equivalent

position upon her return from FMLA leave, ultimately resulting in her discharge. All of these actions,

Worsham alleges, reflect the Park District's failure to bargain in good faith in violation of its written

policies and procedures. The Park District has moved for summary judgment on all of Worsham's

claims. For the reasons set forth below, the motion is granted.

## BACKGROUND

Worsham began working for the Park District as a lifeguard in the Pools & Beaches

Department in 1996. (Def. 56.1 ¶ 6.)[1] She was classified as a "career service" employee under the

Chicago Park District Act and was thus entitled to a hearing before the Park District Personnel

---

[1]     Defendant's 56.1 Statement is cited as "Def. 56.1 ¶ __."

Board prior to termination. (Id. ¶ 8.) *See also* 70 ILCS 1505/16a(c)(4)(J). Worsham was also a member of the Service Employees International Union, Local 73, which had a collective bargaining agreement with the Park District.

In November 2000, Worsham was promoted to the position of Natatorium Instructor, also in the Pools & Beaches Department. (Id. ¶¶ 7, 9.) The parties do not explain how Worsham's job duties changed following the promotion, nor do they describe the general responsibilities of a Natatorium Instructor. By at least 2002, however, Worsham was supervising as many as four Park District pool locations, including, at various times, Fernwood Park, Kennedy Park, Mount Greenwood Park, Ridge Park, and the Chicago High School for Agricultural Sciences.[2] (Anderson Dep., at 62; Worsham Dep., at 20-21, 147.)

## A. The July 2002 Meeting

In July 2002, Worsham attended a pool supervisors meeting during which Park District supervisor Jamie Anderson (exact title unknown) criticized the employees for not doing their jobs. Worsham objected to Anderson's comments and stated that she was "out there for approximately ten hours a day doing my job." (Pl. 56.1 ¶ 25; Worsham Dep., at 39.)[3] According to Worsham, Anderson responded by pointing a finger at her and warning, "if you don't like what I have to say, don't let the door hit you in the ass." (Id.; Worsham Dep., at 39.) Anderson claims that Worsham has taken this statement out of context. He recalls making a similar comment in response to general complaints from the pool supervisors regarding their paperwork requirements, and not to Worsham in particular: "Those are the directives. . . . If people are unhappy, you should not let the

---

[2]     It appears that Worsham also may have supervised the West Pullman Park pool. (*See* Letter of Commendation, Ex. D to Pl. 56.1, at 0030.) The parties do not indicate exactly when Worsham was responsible for supervising each particular pool.

[3]     Plaintiff's statement of additional facts is cited as "Pl. 56.1 ¶ ___."

door hit you in the ass . . . . That goes for everyone in this room, including myself." (Def. 56.1 Resp. ¶ 25; Anderson Dep., at 82.)[4]

Worsham claims that at the same meeting, Terry McShane (male) expressed discontent with the way the junior guard program[5] was being run and yelled expletives at Anderson and another Park District supervisor, Eric Fisher (exact title unknown). Worsham contends that McShane was never reprimanded or disciplined as a result of this outburst, but her own deposition testimony reflects that Anderson and Fisher took McShane to another room where they yelled at him and threatened to call the police if he did not calm down. (Pl. 56.1 ¶ 26; Def. 56.1 Resp. ¶ 26; Worsham Dep., at 30.)

Shortly after the July 2002 meeting, Worsham spoke with union representative Keith Sorensen about filing a grievance regarding Anderson's comment. Sorensen said that he would talk to the union and get back to her, but he never did. (Id. ¶ 28; Worsham Dep., at 47–48.)

## B.   The San Diego Conference

Sometime prior to August 2002, Worsham requested leave to attend the National Lifeguard Championship in San Diego, California. Anderson and Fisher, who were together responsible for determining who was allowed to attend the conference, denied her request, as well as requests submitted by employees Eric Bushonville and Ann Johnstone. Anderson and Fisher granted leave, however, to three other employees, Louis Silva, Erin Joyce, and Jerry Gavin.[6] (Def. 56.1 ¶ 11; Pl. 56.1 ¶ 22; Def. 56.1 Resp. ¶ 22.) Anderson and Fisher both testified that they did not grant requests submitted by supervisors because the Park District is busiest during the summer and needs its "top

---

[4]   Defendant's Response to Plaintiff's Local 56.1(b)(3)(B) Statement of Additional Facts is cited as "Def. 56.1 Resp. ¶ __."

[5]   The parties do not provide any details regarding the junior guard program.

[6]   The parties do not indicate the positions held by any of these employees.

crew" on the job at that time for safety reasons. (Fisher Dep., at 52; Anderson Dep., at 84.) It is undisputed that the Park District did not pay for any of its employees to attend the conference. (Def. 56.1 ¶ 12.)

Though Worsham did not have leave from the Park District to attend the August 2002[7] conference, she went anyway, explaining that she wanted to get a second opinion from a physician she knew in San Diego concerning a skin cancer diagnosis she had received, and "figured that it was a twofold proposition."[8] (Worsham Dep., at 49-50; Def. 56.1 ¶ 11; Pl. 56.1 Resp. ¶ 11.)[9] Worsham requested sick leave for the dates of the conference (August 7 to 11, 2002) and was informed that she had to provide medical documentation upon her return.[10] (Pl. 56.1 Resp. ¶ 11.) Worsham claims that Jerry Gavin told her that he was not required to produce any documentation in order to attend the conference, but as noted, the Park District granted him leave to attend. (Pl. 56.1 ¶ 22.)

When Worsham returned from San Diego, she gave Anderson a note from Dr. Peter G. Wernicki stating that she had been under his care from August 7 to 11, 2002 and was released to return to work on August 12, 2002. She claims that Anderson told her that the note was "no good" and that she would "pay dearly," but the record citations do not support this assertion. (Pl. 56.1 Resp. ¶ 11; Doctor's Note of 8/11/02, Ex. D to Pl. 56.1 Resp., at 020; Grievance Report of 8/28/02,

---

[7]     The parties have submitted conflicting evidence regarding the date of the conference. Their Local Rule 56.1 submissions identify the date as March 2002; their supporting memoranda state that the conference occurred in August 2002. After reviewing the record evidence, the court is satisfied that the conference took place in August. As discussed below, it is undisputed that Worsham requested sick leave in August 2002, and that the request covered the dates of the San Diego conference.

[8]     The record does not reflect when Worsham was first diagnosed with skin cancer.

[9]     Plaintiff's Local Rule 56.1(b) Response to Defendant's Statement of Undisputed Material Facts is cited as "Pl. 56.1 Resp. ¶ __."

[10]     The record does not indicate who told Worsham to provide the documentation.

4

Ex. D to Pl. 56.1 Resp., at 0015.) In any event, Worsham claims that her request for sick leave was ultimately denied, and that she was docked three days pay totaling $387.96.[11] (Grievance Report of 8/28/02.)

Worsham also contends that upon returning from San Diego, she discovered that one of her paychecks had been rescinded from her bank account, causing her car payment to be late and several of her checks to bounce. She apparently inquired about the rescission and was informed by someone at the Park District that Eric Fisher was responsible.[12] (Pl. 56.1 ¶ 23; Worsham Dep., at 91-92.) The Park District believes that Worsham is confusing two separate incidents. The first occurred when someone on the Park District staff failed to give the payroll department Worsham's time sheet in time to credit her direct deposit account. Anderson testified that he called Worsham at home two or three days in advance to notify her about the problem, and that she received a paper check in lieu of direct deposit for that time period. (Def. 56.1 Resp. ¶ 23; Anderson Dep., at 88.) The second incident occurred when Worsham improperly received "health reimbursement"[13] for the December 29, 2002 to January 1, 2003 pay period. Worsham, who did not work during those dates, was not eligible for such reimbursement, but the Park District computers made the payment automatically. When the Park District conducted an audit of that pay period, it discovered the error and "called back" the money that had been erroneously deposited in Worsham's account. (Answers to Interrogatories, Ex. C to Def. 56.1 Resp., ¶ 15.) It is not clear whether the Park District notified Worsham when it "called back" the money.

---

[11]    Worsham does not indicate whether it was Anderson who officially denied her request for sick leave, or when she learned of the decision. As noted earlier, neither party has identified Anderson's title.

[12]    Worsham does not indicate whether she spoke with Fisher about the incident.

[13]    The Park District does not explain what it means by "health reimbursement." (Answers to Interrogatories, Ex. C to Def. 56.1 Resp., ¶ 15.)

## C. Worsham's Reassignment

Effective August 12, 2002, Worsham was reassigned to work exclusively at the Kennedy Park pool. (Pl. 56.1 ¶ 29.) Worsham views the reassignment as a demotion to the position of lifeguard, but the Park District notes that her title remained Natatorium Instructor and that she earned the same rate of pay. (Id.; Def. 56.1 Resp. ¶ 29; Def. 56.1 ¶¶ 18, 19.) Anderson and Fisher decided to transfer Worsham because she repeatedly behaved unprofessionally in voicing her opinions during staff meetings, and because she "wasn't supervising her locations . . ., being respectful and polite to her co-workers," or fulfilling her job responsibilities concerning "coverage for safety." (Anderson Dep., at 62; Fisher Dep., at 61, 63; Def. 56.1 Resp. ¶ 29.) Anderson and Fisher notified Worsham of their decision by memo dated August 12, 2002. The memo confirms that the reassignment related to Worsham's "argu[ing] and challeng[ing] management's decisions in meetings" and "fail[ing] to perform [her] duties and ask[ing] management to do them for [her] instead." (Interoffice Memo of 8/12/02, Ex. D to Pl. 56.1, at 0014.)

## D. Worsham's Union Grievance

As noted, Worsham never heard back from union representative Keith Sorensen when she spoke to him about her grievance request in July 2002. She finally called him in late August 2002 and he told her that he had spoken to an unidentified individual from the union and that she did not have grounds to file a grievance. Unhappy with this response, Worsham called the union herself. Union representative Marilyn Feeny informed Worsham that Sorensen had never contacted the union about filing a grievance on her behalf and, "[w]ithin one hour," Feeny was at Worsham's house to help her do so. (Pl. 56.1 ¶ 28; Worsham Dep., at 47-48.)

Worsham filed her grievance on August 28, 2002, complaining of Anderson's unprofessional comments to her at the July 2002 pool supervisors meeting, and challenging the Park District's decision to deny her request for sick leave for August 7 to 11, 2002, which resulted in her being

docked three days pay. (Grievance Report of 8/28/02, Ex. D to Pl. 56.1, at 0015; Pl. 56.1 ¶ 30.) She also objected to her purported demotion to lifeguard.[14] As support for her grievance, Worsham attached letters from seven individuals praising her performance, including several park supervisors. (Letters of Commendation, Ex. D to Pl. 56.1, at 0029-0035.) The parties do not indicate how Worsham's grievance was investigated or resolved, if at all.

## E.   Worsham's Medical Leave

Worsham never started her new assignment at the Kennedy Park pool because on August 16, 2002, she underwent surgery to remove a cancerous skin lesion. (Worsham Dep., at 84; Undated Letter from Dr. Barsky, Ex. D to Pl. 56.1, at 0021.) Worsham claims that Anderson called her at home the same day and told her that she needed to produce medical documentation within 24 hours if she wanted to keep her job. (Worsham Dep., at 84.) Worsham says that her husband delivered the documents to the Park District the following day. (Id. at 84.) It is not clear what documents he produced or to whom.

On August 29, 2002,[15] Worsham called Park District Human Resources Manager Mary Saieva to request FMLA leave; Saieva sent her a letter the next day granting the request and describing the medical documentation required to support the leave. (Saieva Aff. ¶¶ 1, 2; Letter from Saieva to Worsham of 8/30/02, Ex. 1 to Saieva Aff.) Worsham completed the FMLA Medical Certificate and Acknowledgment of Responsibilities forms on September 3, 2002, and forwarded them to Saieva. (Forms, Ex. 2 to Saieva Aff.) She also gave Saieva a note from her physician, Dr.

---

[14]    Worsham's grievance also confusingly refers to a transfer to Pietrowski Park. As explained below, that transfer did not occur until December 18, 2002, many months after Worsham filed the grievance on August 28, 2002. If she was aware in August that the Park District would transfer her in December, she has not explained how she acquired this information.

[15]    The parties' Local Rule 56.1 submissions indicate that Worsham requested FMLA leave on August 10, 2002 (Def. 56.1 ¶ 14; Pl. 56.1 Resp. ¶ 14), but this is inconsistent with the record evidence. (See Saieva Aff. ¶ 1.) Indeed, Worsham was still at the San Diego conference on August 10 and did not qualify for FMLA leave at that time.

Gary J. Barsky, stating that she would be under his care until October 14, 2002. (Undated Note from Dr. Barsky, Ex. D to Pl. 56.1, at 0021.)

On September 9, 2002, Saieva sent Worsham a letter confirming that she was granted paid FMLA leave until October 14, 2002. Saieva indicated that Worsham would need to submit additional medical documentation to extend the duration of her leave, and that her full 12 weeks of paid leave would be exhausted on November 21, 2002. Saieva noted that if Worsham needed to be off work beyond November 21, she would be required to use her available sick, personal, vacation, and "f-time."[16] (Letter from Saieva to Worsham of 9/9/02, Ex. 3 to Saieva Aff; Def. 56.1 ¶¶ 15, 16.)

On October 9, 2002, Dr. Barsky wrote another note stating that Worsham needed to be "monitored for the next 90 days." (Dr. Barsky Note of 10/9/02, Ex. D to Pl. 56.1, at 0022.) Saieva received the note on October 15, 2002, along with a voice mail message from Worsham requesting an additional 90 days of leave. Saieva left Worsham a voice mail message (presumably the same day) confirming that she had received Dr. Barsky's note and reminding Worsham that she would need to request a leave of absence for the days not covered by her FMLA leave. (Saieva Aff. ¶ 6.) On October 21, 2002, Saieva spoke with Worsham on the telephone and again stated that Worsham needed to file a leave request to cover any leave taken after November 21, 2002. (Id. ¶ 7.) The next day, Dr. Barsky wrote a third note officially stating that Worsham would not be released to return to work until December 18, 2002. (Dr. Barsky Note of 10/22/02, Ex D to Pl. 56.1, at 0023.) Two days later on October 24, 2002, Saieva sent Worsham another letter reminding her that her FMLA leave would be exhausted as of November 21, 2002, and that she would need to submit a Leave Request Form to extend her absence past that date. (Saieva Aff. ¶ 8; Letter from Saieva to Worsham of 10/24/02, Ex. 6 to Saieva Aff.)

---

[16]     The parties do not explain the term "f-time."

8

On October 28, 2002, Worsham completed a Leave Request Form asking to use her sick time to remain off work until December 18, 2002. (Ex. 4 to Saieva Aff.) When Worsham spoke with Saieva on the telephone on November 21, 2002, however, Saieva told Worsham that she still needed to file a leave request with the Human Resources department if she planned to be off work until December 18, 2002. Worsham did not understand why her existing paperwork was insufficient and wrote a letter to Saieva that same day expressing her confusion. Indeed, the record reflects that Worsham had submitted a timely Leave Request Form on October 24, 2002. (Saieva Aff. ¶¶ 9, 10; Letter from Saieva to Worsham of 11/25/02, Ex. 8 to Saieva Aff.; Leave Request Form of 10/28/02, Ex. 4 to Saieva Aff.) In any event, it is undisputed that Worsham was allowed to remain off work on unpaid leave from November 21 until December 18, 2002. (Def. 56.1 ¶¶ 15, 16.)

Worsham claims that throughout her medical leave, she was forced to provide Saieva with medical documentation of her condition on 10 or 12 separate occasions, and was even required to give copies of her medical notes to Anderson and Fisher. (Pl. 56.1 Resp. ¶ 14; Worsham Dep., at 82-85; Leave Request Form of 10/28/02, Ex. D to Pl. 56.1, at 0002.) In addition, Worsham says that someone from the Park District contacted Dr. Barsky on multiple occasions to obtain notes confirming her skin cancer treatment, and that she herself received approximately four telephone calls from Anderson stating that the notes she had submitted were "no good" and that she needed to provide additional documentation or risk termination. (Id.) According to Worsham, Terry McShane told her that he only had to produce one medical note to the Park District during his medical leave.[17] (Pl. 56.1 ¶ 32.)

---

[17] Worsham does not indicate when McShane told her about his medical leave. Nor does she state when the leave occurred, the basis for that leave, or the length of time he was away from work.

9

## F.     Worsham's Termination

Worsham was scheduled to return to work on December 18, 2002. Though she had been reassigned to work at Kennedy Park prior to her medical leave, Anderson and Fisher decided that she should work at the Pietrowski Park pool upon her return. According to the Park District, Anderson and Fisher placed Worsham at Pietrowski Park because there was no existing program in place at that location and they needed a capable employee to set one up.[18] (Anderson Dep., at 75; Worsham Dep., at 143; Def. 56.1 Resp. ¶ 31.)

Worsham failed to return to work on December 18, 2002, claiming that the Pietrowski Park position was at a less desirable location farther from her home and in a more dangerous area of the city. (Pl. 56.1 ¶ 31.) The Park District notes that management has the right to transfer employees to meet the needs of the Park District. (Def. 56.1 Resp. ¶ 31.) Anderson and Fisher testified that they staff pool locations based in part on where the employees live and where they request to work, but also on the needs of the particular location and the skill sets and strong points of the individual employees. (Anderson Dep., at 32; Fisher Dep., at 43.) Worsham herself concedes that employees in the Pools & Beaches Department "are assigned and transferred to various locations in the Park District." (Pl. 56.1 Resp. ¶ 10.) For example, Terry McShane, the employee who yelled at Anderson and Fisher during the July 2002 meeting, was transferred twice in 2002,[19] and Anderson granted Worsham's request for a transfer to Fernwood Park in 2001. (Def. 56.1 Resp. ¶ 26; Anderson Dep., at 20-21.)

On December 27, 2002, Saieva sent Worsham a certified letter informing her that the Park District had scheduled a Corrective Action Meeting for January 6, 2003, due to her failure to return to work after her leave expired on December 18, 2002 and her failure to "provide medical information

---

[18]     The Park District does not describe what the new program would entail.

[19]     The Park District does not indicate the date of McShane's two transfers.

requested."[20] (Letter from Saieva to Worsham of 12/27/03, Ex. 9 to Saieva Aff.) It is not clear whether Worsham attended the Corrective Action Meeting, but the Park District terminated her employment on January 6, 2003 for (1) failing to return to work; (2) failing to "comply with requests for proper documentation [or] utilize proper procedures for requesting an extension on the previously granted FMLA leave"; and (3) failing to return from a "Leave of Absence Without Pay" pursuant to Section 23.1 of the collective bargaining agreement. (Corrective Action Meeting Disposition, Ex. 10 to Saieva Aff.; Def. 56.1 ¶ 20.) The parties do not indicate who made the final decision to discharge Worsham, but the Corrective Action Meeting Disposition setting forth the reasons for the discharge was signed by Marilyn James from Human Resources. (*Id.*) Worsham appealed the decision to the Park District Personnel Board on January 8, 2003 and as of May 10, 2004 was still awaiting a decision in that proceeding. (Appeal of Termination and Request for Appeal Hearing, Ex. 11 to Saieva Aff.; Def. 56.1 ¶ 21; Pl. 56.1 Resp. ¶ 21.)

## G.    Worsham's Lawsuit

Worsham filed a charge of discrimination with the Equal Employment Opportunity Commission on October 4, 2002 alleging that she was transferred to Kennedy Park on the basis of her sex in violation of Title VII. (Complaint ¶ 6.) She received a right to sue letter on November 30, 2002 and, on February 27, 2003, she filed this lawsuit alleging that the Park District (1) transferred and demoted her because of her sex and treated her less favorably than similarly situated men in violation of Title VII; (2) failed to offer her the same or equivalent position upon her return from FMLA leave; and (3) breached an implied employment contract by failing to bargain in good faith and to "judge plaintiff on the basis of merit and ability" as required by the Park District's personnel policies and procedures. (*Id.* ¶¶ 7-33.) The Park District seeks summary judgment on all three claims.

---

[20]    It is not clear what medical information Worsham failed to provide.

11

## DISCUSSION

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). The court's function in ruling on a motion for summary judgment is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Where factual matters are in dispute, the court is required to credit the nonmovant's version of events. *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 802 (7th Cir. 2000). The nonmoving party must do more, however, than demonstrate a factual dispute; she must offer evidence sufficient to support a verdict in her favor. *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001). Employment discrimination cases are inherently fact-intensive, but the court is not required to "scour the record" in an effort to assist the plaintiff in avoiding summary judgment. *Greer v. Board of Ed. of City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001).

The Park District argues that Worsham cannot set forth a prima facie case of sex discrimination or demonstrate that the position she was offered upon her return from FMLA leave was not the same or equivalent to her previous position. The Park District also argues that Worsham's claim for breach of contract is premature because she has not yet exhausted her administrative remedies. The court considers each argument in turn.

### A.    Sex Discrimination

Worsham may establish sex discrimination using either the direct or indirect method of proof. Under the direct method, Worsham must either present direct evidence which, if believed

by the finder of fact, "will prove the particular fact in question without reliance upon inference or presumption," or circumstantial evidence that establishes a "convincing mosaic" of discrimination. *Volovsek v. Wisconsin Dep't of Agriculture, Trade and Consumer Protection*, 344 F.3d 680, 689 (7th Cir. 2003); *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003). Worsham does not claim to have any evidence of discrimination supporting the direct method of proof and must therefore proceed under the familiar *McDonnell Douglas* burden-shifting analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that approach, she must first establish a prima facie case of discrimination by proving that (1) she is a member of a protected class; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) a similarly situated employee not in the protected class was treated more favorably. *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004). If Worsham succeeds in making out a prima facie case, the Park District must articulate a legitimate, non-discriminatory explanation for the adverse employment action. If it does so, the Park District "would then be entitled to summary judgment unless [Worsham] can rebut this explanation with evidence that it is pretextual." *Id.* at 978-79 (citing *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 886 (7th Cir. 2001)).

The Park District claims that Worsham cannot establish a prima facie case of sex discrimination because she did not suffer an adverse employment action and cannot identify any similarly situated male employees who were treated more favorably. The Park District also argues that Worsham cannot demonstrate that its stated reason for her transfer is a pretext for unlawful sex discrimination.

### 1. Adverse Employment Action

Worsham claims that she suffered an adverse employment action in August 2002 when her supervisors transferred her to work at the Kennedy Park pool. Worsham acknowledges that she did not experience any reduction in pay or benefits, and it appears that she retained the same job

13

title of Natatorium Instructor. (Pl. Resp., at 7; Def. 56.1 Resp. ¶ 29.)[21] Nevertheless, Worsham claims that her job responsibilities decreased adversely; instead of supervising as many as four pools, she only supervised one. (Id.) (citing *Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 651 (7th Cir. 2001) ("[A]n ostensibly lateral transfer may be an adverse employment action in some situations if it is accompanied by a dramatic downward shift in skill level required to perform job responsibilities.") (internal quotations omitted). The Park District denies that the transfer to Kennedy Park constituted a demotion, and notes that employees were often reassigned to different locations depending upon the needs of the Park District. (Def. Reply, at 9.)[22]

The Seventh Circuit recently addressed the requirements for an adverse employment action in *O'Neal v. City of Chicago*, 392 F.3d 909 (7th Cir. 2004). The plaintiff in *O'Neal* worked as a police officer and sergeant with the Chicago Police Department ("CPD") before being promoted to the position of administrative sergeant in the CPD's Narcotics and Gangs Investigations Section of the Organized Crime Division ("Narcotics Unit"). Three months after the promotion, however, the plaintiff was transferred to the position of beat sergeant in one of the districts as a security precaution taken in response to a rumor that she had previously dated a former Chicago police officer who had been convicted of selling narcotics eight years earlier. *Id.* at 910. The plaintiff filed suit against the City of Chicago and the Chief of the Organized Crime Division alleging that the transfer constituted sex discrimination. *Id.* The district court granted summary judgment in favor of the defendants, finding that the plaintiff did not suffer a legally cognizable adverse employment action. *Id.*

---

[21] Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment is cited as "Pl. Resp., at ___."

[22] Defendant's Reply Brief in Support of its Motion for Summary Judgment is cited as "Def. Reply, at ___."

On appeal to the Seventh Circuit, the plaintiff admitted that the two positions held the same rank within the police department and received the same pay and benefits, but she nevertheless argued that the transfer effectively was a demotion. The court noted that there are three categories of materially adverse employment actions for purposes of a Title VII claim:

(1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

Id. at 911. Cases in the second category involve a future, and not a present harm. In addition, "[a] transfer involving no reduction in pay and no more than a minor change in working conditions will not do." Id. at 911-12 (quoting Herrnreiter v. Chicago Housing Authority, 315 F.3d 742, 744 (7th Cir. 2002)).

The plaintiff claimed that the transfer negatively affected her chances of promotion by moving her to a less prestigious position; marred her reputation "by implicitly accepting the rumor, despite the evidence that [she] never had the relationship in question"; reduced her opportunities for overtime pay and her supervisory responsibilities; and deprived her of certain job perks, including a cellular telephone, pager, vehicle, parking space, and weekends and holidays off. Id. at 911-12. The court first held that the plaintiff's mere speculation that sergeants in the Narcotics Unit are more likely to be promoted than sergeants in the districts was insufficient to establish that her lateral transfer constituted an adverse employment action. The court also found that the plaintiff "presented no evidence that the transfer, the employment action at issue, rather than the rumor itself, caused th[e] harm" to her reputation. Id. at 912.

As for the reduced supervisory responsibilities and job perks, the court noted that "[b]y definition, any lateral job transfer will result in changes to an employee's job responsibilities and work conditions. To sustain a federal employment discrimination suit, a plaintiff must show something more than the ordinary difficulties associated with a job transfer." *Id.* at 913. As an administrative sergeant, the plaintiff scheduled twenty security employees and supervised employees on the night shift; as a beat sergeant, the plaintiff oversaw sixteen officers responding to calls in the field. *Id.* at 912. In the court's view, the plaintiff had significant supervisory responsibilities in both positions and her "purely subjective preference for one position over another" did not "justify trundling out the heavy artillery of federal antidiscrimination law." *Id.* at 913 (quoting *Herrnreiter*, 315 F.3d at 745).

In this case, Worsham complains only that after her transfer to the Kennedy Park pool, she was no longer responsible for supervising more than one pool location. (Pl. Resp., at 7.) Worsham has not suggested that her transfer to the Kennedy Park pool significantly reduced her career prospects such that her skills were likely to atrophy. *Compare Hoffman-Dombrowski*, 254 F.3d at 649-51 (plaintiff raised genuine issue of fact as to whether she suffered adverse employment action where, after a purportedly lateral transfer, she went from "preparing the mutual budget and payroll and staffing hundreds of clerks to scheduling one part time and four full time clerks," and her "biggest responsibility [became] emptying lottery machines three times a week.") Nor has she presented evidence that the Kennedy Park position is so obviously inferior that individuals would universally prefer Worsham's previous assignment. *Compare Tart v. Illinois Power Co.*, 366 F.3d 461 (7th Cir. 2004) (transfer constituted an adverse employment action where "[f]ew workers in today's job market would choose to give up access to computers so they could spend the winter on trenchers and with shovels, digging the holes that made way for other workers to complete the skilled part of the labor.")

Like the plaintiff in *O'Neal*, Worsham had supervisory responsibilities both before and after the transfer. Her preference for supervising four pools rather than one is insufficient to demonstrate that the transfer constituted an adverse employment action for purposes of Title VII. *O'Neal*, 392 F.3d at 913. *See also Place v. Abbott Labs.*, 215 F.3d 803, 810 (7th Cir. 2000) (rejecting the plaintiff's argument that being "moved from an interesting job she liked that involved overseeing several other people to a boring job she didn't like and that lacked any supervisory duties" was an adverse employment action).

Worsham does not argue that her transfer to Pietrowski Park in December 2002 constituted unlawful sex discrimination, but the court notes that this second transfer also does not qualify as an adverse employment action. The Pietrowski Park and Kennedy Park positions both have the same title, pay, and benefits, and there is no evidence that the responsibilities differ in any substantial way such that her career was likely to be stunted. (Def. 56.1 ¶¶ 18, 19.) Worsham claims that the Pietrowski Park pool is located further from her home in a "more dangerous" neighborhood, but she has not provided any information regarding how much further she had to travel or what made the neighborhood more dangerous than Kennedy Park. Once again, Worsham's preference for working at Kennedy Park is insufficient to demonstrate that she suffered an adverse employment action. *O'Neal*, 392 F.3d at 913; *Place*, 215 F.3d at 810.

### 2. Similarly Situated Employees

Even if Worsham's transfers were adverse employment actions, she has not identified any similarly situated male employees who received more favorable treatment. As noted, Worsham argues that after voicing her opinions at a July 2002 pool supervisors meeting, she was transferred to a less desirable position at the Kennedy Park pool and charged with failing to perform her job duties. She claims that a male employee, Terry McShane, similarly spoke out at that meeting and even cursed at his supervisors, but he was never reprimanded, disciplined, or transferred. (Pl.

Resp., at 7.) This is not entirely accurate. Worsham admits that Anderson and Fisher took McShane into another room, yelled at him, and even threatened to call the police if he failed to calm down. More importantly, Worsham's supervisors indicated that she had been argumentative and disruptive in meetings on more than one occasion. (Interoffice Memorandum of 8/12/02; Def. 56.1 Resp. ¶ 29.) There is no evidence that McShane was similarly disruptive more than once. *See Mora v. Chicago Tribune*, 57 F. Supp. 2d 626, 635 (N.D. Ill. 1999) (to be similarly situated, employees must have "engaged in similar misconduct giving rise to the employment action.") Worsham's unsupported assertion that "[o]ther" Park District employees have criticized management during meetings is also unavailing; she has not identified any such employees, much less demonstrated that they engaged in similar misconduct. (Pl. 56.1 ¶ 27.)

Worsham next argues that the Park District subjected her to differential treatment with respect to her medical leave by repeatedly requiring her to provide copies of medical notes not only to Mary Saieva but also to her supervisors, and by contacting her physician on several occasions to obtain additional documentation of her skin cancer treatment. In addition, Anderson called Worsham several times to demand that she submit the necessary paperwork or risk losing her job, including one call on the day of her surgery. (Pl. Resp., at 7-8.) Worsham claims that McShane told her that when he went on medical leave, he was only required to provide the Park District with one medical note. (*Id.* at 8.) The first problem with this argument is that McShane's alleged statement constitutes inadmissible hearsay, which is not sufficient to defeat a motion for summary judgment. *Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 713 (7th Cir. 2002) (where plaintiff was "repeating what his wife told him, that evidence is inadmissible hearsay."); *Village of Lincolnshire v. Illinois Dep't of Transp.*, No. 01 C 5974, 2002 WL 276127, at *4 (N.D. Ill. Feb. 27, 2002) ("The law in the Seventh Circuit is clear that in response to a motion for summary judgment, the non-moving party may not rely upon inadmissible hearsay in an affidavit or deposition to defeat

18

a motion for summary judgment.") Moreover, Worsham has not provided any details enabling a conclusion that McShane's medical leave was comparable to her own.[23]

### 3.  Pretext

Having determined that Worsham failed to establish a prima facie case of sex discrimination, the court need not consider whether the Park District's explanation for her transfer to the Kennedy Park pool – her repeated arguments with management during meetings and her failure to perform her job duties – is a pretext for unlawful discrimination. The court notes, however, that Worsham's only argument in this regard is that she received seven letters of commendation from various park supervisors and patrons. (Pl. Resp., at 8.) The fact that some individuals, none of whom appear to have had any supervisory authority over Worsham, believed that she was performing well is not sufficient to demonstrate that the actual decisionmakers, Anderson and Fisher, transferred her for discriminatory reasons. *See, e.g., Abioye v. Sundstrand Corp.*, 164 F.3d 364, 369 (7th Cir. 1998) (affidavits from plaintiff's mentor and previous supervisor did not establish that employer's decision to discharge plaintiff for poor performance was pretextual). At most, Worsham has raised a question as to "the overall correctness or desirability of the reasons proffered [which] is not relevant to the determination of pretext." *Baron v. City of Highland Park*, 195 F.3d 333, 341 (7th Cir. 1999). *See also Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 459 (7th Cir. 1999) (to show pretext, plaintiff must produce evidence that evaluation of his performance was dishonest, not merely mistaken). The Park District's motion for summary judgment on Worsham's Title VII claim is granted.

---

[23]     In her Local Rule 56.1 statement, Worsham also suggests that Anderson and Fisher unfairly denied her request for leave to attend the San Diego conference in August 2002. As noted, however, Anderson and Fisher similarly denied requests submitted by Eric Bushonville (male) and Ann Johnstone (female). As for Worsham's objection that unlike Jerry Gavin, she had to submit medical documentation upon her return from that conference, the court notes that unlike Worsham, Gavin had permission to attend the conference.

## B.    FMLA

The Park District also seeks summary judgment on Worsham's FMLA claim, arguing that "she cannot show that she *would not* have been restored to an equivalent position had she returned [to work] at the end of her leave." (Def. Mem., at 9) (emphasis in original.) The Park District notes that Worsham received her full 12 weeks of FMLA leave – plus several additional weeks of unpaid leave – but refused to return to work despite being offered an equivalent position at a different pool location. (*Id.*) Worsham insists that she was offered a position at a less desirable location farther from her home and in a more dangerous area of the city. (Pl. Resp., at 9.)

The FMLA provides that "any eligible employee who takes leave [under the Act] . . . shall be entitled, on return of such leave – (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1). The right to reinstatement is not, however, absolute, "for the statute does not confer benefits to which an employee would not be entitled had the employee not taken leave." *Ogborn v. United Food and Commercial Workers Union, Local No. 881*, 305 F.3d 763, 768 (7th Cir. 2002) (citing 29 U.S.C. § 2614(a)(3)(B). At all times, the employee bears the burden of establishing her right to be restored to the same or equivalent position. *Kohls v. Beverly Enterprises Wisconsin, Inc.*, 259 F.3d 799, 804 (7th Cir. 2001).

The court finds that Worsham's FMLA claim fails for several reasons. First, there is no evidence that Worsham ever attempted to return to work at the end of her leave. Mary Saieva in Human Resources sent Worsham a letter on December 27, 2002 stating that the Park District had scheduled a Corrective Action Meeting, in part because Worsham failed to return to work after her leave expired on December 18, 2002. (Letter from Saieva to Worsham of 12/27/03, Ex. 9 to Saieva Aff.) Worsham was subsequently discharged at that January 6, 2003 Corrective Action Meeting,

some two weeks after she first failed to show up for work or to produce any documentation suggesting that she was medically unable to do so. (Corrective Action Meeting Disposition, Ex. 10 to Saieva Aff.) An employee on FMLA leave has "no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed." 29 C.F.R. § 825.216(a). Worsham has not shown that the Park District's decision to discharge her for failing to show up for work after her leave expired was unlawful. See, e.g., Morris v. IBM Global Servs., No. 04 C 130, 2005 WL 83336, at *3 (N.D. Ill. Jan. 14, 2005) (employer did not violate FMLA by discharging employee who failed to return to work at the expiration of her 12 weeks of leave; "When an employee returns from FMLA leave in a timely fashion, the employer must reinstate the employee to his or her former or an equivalent position.") (emphasis added).

Worsham argues that she refused to show up for work because the Park District failed to offer her an equivalent position, assigning her instead to the undesirable Pietrowski Park location. An equivalent position under the FMLA "is one that is virtually identical to the former position in terms of pay, benefits, and working conditions." Mitchell v. Dutchmen Mfg., Inc., 389 F.3d 746, 748 (7th Cir. 2004) (citing 29 C.F.R. § 825.215(a)). It must involve the same or substantially equivalent skill, effort, responsibility, and authority. 29 C.F.R. § 825.215(a). Prior to her request for leave, Worsham was assigned to work at the Kennedy Park pool. The court has already determined that there was nothing discriminatory about this assignment for purposes of Title VII. Nor could the assignment implicate the FMLA; Anderson and Fisher assigned Worsham to Kennedy Park on August 12, 2002, more than two weeks before she requested FMLA leave on August 29, 2002.

As for the Pietrowski Park assignment, Worsham's assertion that it is not equivalent to the position at Kennedy Park is unavailing. Both positions have the same title, pay, and benefits, and there is no evidence that the responsibilities differ in any substantial way. (Def. 56.1 ¶¶ 18, 19.) Indeed, it appears that at Pietrowski Park, Worsham would have the increased responsibility she

21

desired because Anderson and Fisher wanted her to set up a brand new program there. (Anderson Dep., at 75; Worsham Dep., at 143; Def. 56.1 Resp. ¶ 31.) Worsham may have preferred working closer to home in what she believed to be a nicer neighborhood, but these are "de minimis or intangible, unmeasurable aspects of the job" that are insufficient to demonstrate that the Pietrowski Park and Kennedy Park positions are not equivalent. See 29 C.F.R. § 825.215(f). Significantly, Worsham has not indicated how much farther she had to travel to get to Pietrowski Park compared with Kennedy Park, nor has she explained what made the Pietrowski Park location "more dangerous." In addition, Worsham has not presented any evidence that her working conditions at Pietrowski Park would be substantially different from those at Kennedy Park, or that the Pietrowski Park position involved different skill, effort, or authority.

In any event, regardless of whether the Park District offered Worsham an equivalent position, her FMLA claim fails because there is no evidence that the Pietrowski Park transfer was in any way connected to her FMLA leave. As noted, the right to reinstatement is not absolute, and "[a]n employee is not afforded greater rights than he would otherwise have merely because he takes FMLA leave." Phelan v. City of Chicago, 347 F.3d 679, 683 (7th Cir. 2003). Anderson and Fisher testified that they staff pool locations based in part on where the employees live and where they request to work, but also on the needs of the particular location and the skill sets and strong points of the individual employees. (Anderson Dep., at 32; Fisher Dep., at 43.) They placed Worsham at Pietrowski Park because there was no existing program in place at that location and they needed a capable employee to set one up. (Def. 56.1 Resp. ¶ 31; Anderson Dep., at 75; Worsham Dep., at 143.)

Worsham has not presented any evidence suggesting that had she not taken FMLA leave, she would not have been transferred to Pietrowski Park. See Kohls, 259 F.3d at 805 (employee "must prove that [her employer] would not have discharged her had she not taken FMLA leave.")

22

Significantly, Worsham herself concedes that employees in the Pools & Beaches Department "are assigned and transferred to various locations" depending upon the needs of the Park District. (Pl. 56.1 Resp. ¶ 10.) Her bald assertion that she was "terminated under false pretexts" is wholly insufficient to defeat the Park District's summary judgment motion on her FMLA claim. *See Miranda v. Wisconsin Power & Light Co.*, 91 F.3d 1011, 1018 (7th Cir. 1996) ("Conclusory and generalized assertions are not sufficient to survive a motion for summary judgment.")

## C.     Breach of Contract

In the final count of her Complaint, Worsham alleges that the Park District breached an implied employment contract by failing to bargain in good faith and to "judge plaintiff on the basis of merit and ability" as required by the Park District's personnel policies and procedures. (Complaint ¶¶ 19-25.) The Park District argues that this claim is premature because Worsham has not exhausted her administrative remedies before the Park District Personnel Board. Worsham concedes the point, agreeing that "her claim for breach of contract should not proceed until the appeal of her termination that she filed more than a year ago is heard." (Pl. Resp., at 1.) In light of this concession, the Park District's motion for summary judgment on the breach of contract claim is granted.

**CONCLUSION**

For the reasons stated, the Park District's motion for summary judgment (Docket No. 16-1) is granted.

ENTER:

Dated:   March 16, 2005

REBECCA R. PALLMEYER
United States District Judge

23